PUBLISHED

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

ELIZABETH F. SMITH,
Plaintiff-Appellant,

v.                                                                              No. 98-2200

FIRST UNION NATIONAL BANK,
Defendant-Appellee.

Appeal from the United States District Court
for the Western District of North Carolina, at Charlotte.
Robert D. Potter, Senior District Judge.
(CA-97-127-3-P)

Argued: September 22, 1999

Decided: January 19, 2000

Before MURNAGHAN, MICHAEL, and KING, Circuit Judges.

_____

Affirmed in part, reversed in part, and remanded by published opin-
ion. Judge Murnaghan wrote the opinion, in which Judge Michael and
Judge King joined.

_____

COUNSEL

**ARGUED:** Julie Hanna Fosbinder, SHARPE & FOSBINDER, P.A.,
Charlotte, North Carolina, for Appellant. Charles Evans Johnson,
KILPATRICK STOCKTON, L.L.P., Charlotte, North Carolina, for
Appellee. **ON BRIEF:** Jenny L. Sharpe, SHARPE & FOSBINDER,
P.A., Charlotte, North Carolina; Charles McB. Sasser, COX, GAGE
& SASSER, Charlotte, North Carolina, for Appellant. Cynthia A.

Glasgow, KILPATRICK STOCKTON, L.L.P., Charlotte, North Carolina, for Appellee.

_____

**OPINION**

MURNAGHAN, Circuit Judge:

Elizabeth Smith appeals from the district court's order granting summary judgment in favor of First Union National Bank on Smith's claims for sexual harassment under Title VII, sexual harassment under N.C. GEN. STAT.§ 143-422.2, retaliation under Title VII, negligent supervision or retention, and a Fair Labor Standards Act (FLSA) claim based on a failure to pay overtime wages. We affirm in part, reverse in part, and remand.

I.

Because we are reviewing a grant of summary judgment in favor of First Union, we state the following facts in the light most favorable to Smith. See Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 255 (1986). Smith worked for First Union from January 1990 until November 1995. Smith initially worked as an adjustor, and her duties consisted of calling and arranging for payment from customers who had delinquent accounts. As an adjustor, she was paid hourly, and as a nonexempt employee under the FLSA she received overtime pay.

In January 1993, First Union promoted Smith to the position of team leader in the Consumer Credit Collections Department. The position of team leader at First Union was a supervisory position. Smith assisted her manager, the collection supervisor, in managing and supervising the work of sixteen adjustors. Smith was responsible for implementing and communicating collection procedures, interviewing and assisting in the hiring of adjustors, monitoring the performance of adjustors on her team, and preparing regular reports showing the performance of her team.

When Smith became a team leader, she initially reported to collection supervisor Barbara Judge. In March or April of 1993, however,

2

Smith began reporting to collection supervisor Ronald Scoggins. Scoggins subjected Smith to a barrage of threats and gender-based insults while she was under his supervision. Scoggins directed some of his remarks at Smith individually, while other remarks reflected Scoggins' hostile view of women in general.

Scoggins' remarks began when he informed Smith that he would have preferred a male in the team leader position because males are "natural leaders." Scoggins made this comment more than thirty times in the first few weeks that he supervised Smith. Scoggins also told Smith that women should not be in management because they are "too emotional to handle a managerial role." When a female employee was upset, Scoggins would frequently remark to Smith that the employee was menstruating or that she needed a "good banging." Scoggins did not make these types of remarks about male employees.

Scoggins also demeaned the workplace successes of women at First Union. Scoggins told Smith that "the only way for a woman to get ahead at First Union was to spread her legs." Scoggins told Smith that he wished he had been a woman so that he could"whore his way through life." Scoggins claimed that women should be barefoot and pregnant, and that they went through life looking for a man to marry.

Scoggins' behavior toward Smith was often threatening. For instance, Scoggins began standing over Smith's cubicle and barking orders at her. Scoggins often concluded his orders to Smith with the remark, "or else you'll see what will happen to you." Scoggins also threatened Smith when he called her at home at 10:00 p.m., accusing her of conspiring with his supervisor, George Andrews, to "get him."

In mid-1995, First Union selected Scoggins as a team leader after an internal administrative reorganization.[1] Smith elected not to remain on Scoggins' team and Scoggins' harassment of Smith consequently escalated. In October 1995, Scoggins appeared in Smith's cubicle as

_____

[1] First Union consolidated Scoggins' position as collection supervisor and Smith's position as team leader as of December 1995. Scoggins and Smith applied for one of the new "team leader" positions. Scoggins was selected and Smith was not. Smith left First Union before the consolidation took effect.

3

she was sitting at her desk. Scoggins grabbed the handles of Smith's chair and spun her around to face him. Scoggins then looked her over and stated, in an apparent reference to the O.J. Simpson trial, that he could "see why a man would slit a woman's throat."

Smith took Scoggins' remark as a serious threat because of the way that he made the remark and his tone of voice. Smith's fear was also based on Scoggins' frequent discussions of his alleged military background, in which he bragged about having to "take people out." Smith thus believed that Scoggins was capable of acting violently against her, and, consequently, feared for her safety.

On November 3, 1995, Smith made her first formal complaint about Scoggins' harassment to First Union's human resources representative, Marc Hutto.[2] Smith did not complain previously about Scoggins' behavior for three reasons: first, Scoggins' boss told Smith that she should never complain to human resources if she "ever wanted to get anywhere"; second, Scoggins threatened that Smith would lose her job if she complained about his conduct; and third, Smith did not understand that Scoggins' behavior constituted sexual harassment. First Union's policy prohibited only"sexual harassment, sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature." Smith understood this to mean that a sexual advance was needed from the perpetrator for the conduct to constitute a violation of First Union's policy. Consequently, Smith did not raise a claim of gender-based harassment before November 3, 1995, because she did not understand that she could do so.

In Smith's first compliant to Hutto, she advised Hutto of Scoggins' threat about slitting a woman's throat, and that this remark and Scoggins' other violent conduct made her feel physically threatened. Smith also advised Hutto about Scoggins' statements concerning women in management, and his statements that he would not have selected Smith as a team leader because she was a woman. Smith asked Hutto to keep her complaint anonymous because she feared retaliation by

_____

[2] Smith complained to First Union management in July 1995 about certain foreclosure procedures implemented by Scoggins that Smith believed were improper. However, the July 1995 complaint did not involve Scoggins' harassment of Smith.

4

Scoggins and First Union management. Smith also requested that First Union remove her from Scoggins' work area immediately.

Over the next few weeks, Smith told Hutto about some of the other harassing remarks made by Scoggins.[3] At Hutto's request, Smith contacted a number of her coworkers and asked that they contact Hutto about their work experiences with Scoggins. Barbara Judge contacted Hutto and told him that another employee had left First Union because of Scoggins' "alleged verbal, sexual harassment," and that Scoggins had made "comments to [Smith] which [were] derogatory towards women." Other employees also told Hutto that Scoggins was threatening and demeaning, and often talked "ugly" to Smith.

Hutto informed Smith on or about November 9, 1995, that he had interviewed enough people. At that time, Smith told Hutto that she believed that her complaint would no longer be confidential, and asked that First Union remove her from Scoggins' floor entirely because she feared for her personal safety.

First Union's investigation of Smith's complaints focused on Smith's concerns about Scoggins' management style, and ignored Smith's allegations of sexual harassment. Neither Hutto nor anyone else at First Union asked Scoggins whether he made any of the sexually harassing remarks. In addition, First Union did not follow up on the allegation that another employee had left First Union due to Scoggins' sexual harassment.

First Union never reprimanded Scoggins for his harassment of Smith nor did First Union even discuss the topic of sexual harassment with Scoggins. Instead, First Union put Scoggins on probation for ninety days because of his inappropriate management style; however, First Union allowed Scoggins to remain in his position in the Consumer Credit Department.

On November 14, 1995, First Union temporarily suspended Smith and Scoggins with pay. First Union sent both parties to its Employee

─────────────────────────────────────────────

[3] Specifically, Smith told Hutto about Scoggins' "wish" that he could be a woman and "whore his way through life." She also told Hutto about the "women get ahead at First Union by spreading their legs" remark.

Assistance Program (EAP). At her first EAP meeting, Smith told Michael Price, the EAP counselor, about the fear and intimidation she felt because of Scoggins' conduct toward her. Price advised Smith not to return to work near Scoggins.

First Union agreed to transfer Smith out of Scoggins' work-team and into the Val Arthur team. The Arthur team, however, was located on the same floor as Scoggins' team. The distance between Scoggins' team and Arthur's team was only 100 feet. The proximity between the teams and First Union's business practices made it likely that Smith would run into Scoggins on a daily basis. Price told Hutto that Smith should not have been placed in an area where she would have daily contact with Scoggins.

Smith met with Hutto in person for the first time on November 17, 1995. Smith and Hutto discussed the threats and harassing remarks that Scoggins made to Smith. Although Hutto made several suggestions concerning how Smith might return to work, they did not reach any decisions except that she would return to work within a week. Smith contacted Price following the meeting and Price informed her that First Union was not following his advice that Smith not be assigned to work in the same area as Scoggins.

After consulting with a therapist, Smith applied for disability benefits. The therapist determined that Smith was suffering from an adjustment disorder caused, at least in part, by Scoggins' harassing conduct. The therapist recommended that Smith should not work in the same environment as Scoggins. When Smith related her therapist's advice to Hutto, he became annoyed and warned Smith that if she did not submit her disability forms within fifteen days, she would be subject to termination from First Union. Subsequently, on December 22, 1995, Hutto advised Smith that she could transfer to another location only if she first returned to her former position, which she declined to do. On January 26, 1996, First Union finally told Smith that she could post for positions outside the Consumer Credit Department. Smith began searching for positions within First Union's organization during early February 1996. Smith diligently searched for jobs that would have allowed her to return to work. She submitted applications for at least seventy-five positions over a three-month period.

6

Smith did not receive a job offer from First Union. First Union gave Smith only two interviews out of the seventy-five jobs for which she submitted applications. Smith claims she was qualified to assume many of the positions that she applied for within First Union. Smith admits that most of the jobs she applied for were at grade 32, which was higher than Smith's grade 30 status. Smith applied for mostly grade 32 positions because she had been earning incentive pay along with her grade 30 salary. Smith thus had to work at a grade 32 position to maintain her former salary level. Although Smith never received a new position, she remained on First Union's payroll receiving disability benefits until First Union permanently removed her from the payroll in July 1996.

On February 12, 1996, Smith filed a charge of discrimination with the EEOC. The charge claimed that Scoggins sexually harassed Smith and that First Union retaliated against her by threatening to terminate her employment for consulting with counsel. On November 22, 1996, the EEOC dismissed Smith's charge of discrimination and issued her a right to sue letter.

On February 20, 1997, Smith filed suit against First Union in Mecklenburg County, N.C., Superior Court, alleging sexual harassment under Title VII, sexual harassment under N.C. Gen. Stat. § 143-422.2, retaliation under Title VII, negligent supervision or retention, intentional and negligent infliction of emotional distress, and a Fair Labor Standards Act claim based on a failure to pay overtime wages. First Union removed the action to the Western District of North Carolina on April 22, 1997. First Union then filed a motion for summary judgment on all counts of Smith's Complaint. The district court granted First Union's motion on all counts on July 2, 1998. Smith appeals on all of her claims except her claims for intentional and negligent infliction of emotional distress.[4]

_____

[4] Smith did not brief her emotional distress claims and admitted in her reply brief that she was abandoning them for purposes of the instant appeal.

7

II.

Smith argues that First Union discriminated against her on the basis of her gender in violation of Title VII. Title VII provides that it shall be an unlawful employment practice for an employer to fail or refuse to hire, discharge, or otherwise discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment because of such person's gender. See 42 U.S.C. § 2000e-2(a)(1). An employee's work environment is a term, condition, or privilege of employment. See Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 73 (1986). A cause of action therefore may exist under Title VII if sexual harassment creates a hostile work environment or abusive atmosphere. See id.

An employee must prove the following to prevail on a hostile work environment claim: (1) that she was harassed "because of" her "sex"; (2) that the harassment was unwelcome; (3) that the harassment was sufficiently severe or pervasive to create an abusive working environment; and (4) that some basis exists for imputing liability to the employer. See Hartsell v. Duplex Prods., Inc. , 123 F.3d 766, 772 (4th Cir. 1997). First Union contends that summary judgment was appropriate because Scoggins did not harass Smith "because of" her gender. An employee is harassed or otherwise discriminated against "because of" his or her gender if, "but for" the employee's gender, he or she would not have been the victim of the discrimination. Wrightson v. Pizza Hut of America, Inc., 99 F.3d 138, 142 (4th Cir. 1996).

First Union attempts to argue that Smith was not harassed "because of" her gender because both male and female members of Scoggins' team complained about his management style. One glance at the harassing remarks made by Scoggins to Smith, however, makes it clear that Scoggins singled her out for harassment because of her gender. Explicit and derogatory references to women appear in virtually all of Scoggins' harassing remarks. Smith therefore has sufficiently alleged that Scoggins harassed her "because of" her gender. See Steiner v. Showboat Operating Corp., 25 F.3d 1459, 1464 (9th Cir. 1994) ("It is one thing to call a woman `worthless,' and another to call her a `worthless broad.'").

The second element of a hostile work environment claim is that the harassment was unwelcome. See Hartsell, 123 F.3d at 772. First

8

Union does not claim that Smith welcomed Scoggins' harassment. Further, Smith repeatedly told Scoggins that his remarks were offensive to her and that the remarks were undermining the morale of the female employees. Smith therefore has sufficiently alleged that Scoggins' harassment was unwelcome.

The third element of a hostile work environment claim is that the harassment must be sufficiently severe or pervasive so as to create a hostile work environment. See Hartsell, 123 F.3d at 772. A court must look at all the circumstances to determine whether a work environment is hostile or abusive. These circumstances include: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance. See Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993). The district court found for First Union as a matter of law because "[p]laintiff has not claimed that Scoggins ever inappropriately touched, propositioned or ogled her, that Scoggins ever invited her, explicitly or by implication, to have sex with him or to go out on a date with him."

The district court failed to recognize that a woman's work environment can be hostile even if she is not subjected to sexual advances or propositions. See, e.g., Smith v. St. Louis University, 109 F.3d 1261, 1265 (8th Cir. 1997). Instead, an employer violates Title VII "[w]hen the workplace is permeated with `discriminatory intimidation, ridicule, and insult,' that is `sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . . .'" Harris, 510 U.S. at 21 (quoting Meritor, 477 U.S. at 65, 67) (citation omitted). A work environment consumed by remarks that intimidate, ridicule, and maliciously demean the status of women can create an environment that is as hostile as an environment that contains unwanted sexual advances.

First Union relies heavily on Hartsell in arguing that Scoggins' harassment was not severe or pervasive as a matter of law. First Union's attempt to link Scoggins' harassment of Smith to Hartsell is not convincing. The factors we must consider under Harris establish that Scoggins' harassment of Smith was more severe and pervasive than what the plaintiff experienced in Hartsell . The plaintiff in

9

Hartsell was subjected to four isolated, nonthreatening remarks by coworkers during her tenure at Duplex.[5] Conversely, in the present case, Scoggins, Smith's supervisor, subjected Smith to repeated remarks that belittled her because she was a woman. [6] Scoggins directed his insults at Smith on a regular basis; Scoggins made many of the remarks at least once a month when Smith worked at First Union.

_____

[5] In Hartsell, the plaintiff's coworkers made the following remarks that the court found were gender-based: (1) "We've made every female in this office cry like a baby"; (2) "Why don't we have sales assistants like that?," upon seeing a buxom woman in a company magazine; (3) a question to another sales representative as to whether she would be a "mini van driving mommy" or "be a salesperson and play with the big boys"; and (4) a statement to plaintiff that she should "go home and fetch [her] husband's slippers like a good little wife." Hartsell, 123 F.3d at 773. The court found that these comments were not sufficiently severe or pervasive so as to create a jury issue on the plaintiff's hostile work environment claim.

[6] This issue involves determining whether Scoggins' harassment was severe or pervasive enough so as to create a hostile work environment. Although a number of Scoggins' discriminatory remarks are mentioned in Section I, it is instructive to list them again here. Scoggins' discriminatory remarks to Smith included the following: (1) Scoggins would have preferred a male in the team leader position because males are "natural leaders"; (2) Smith would "crack" because women "are not emotionally capable of handling the management role"; (3) Scoggins would frequently remark to Smith that a woman who was upset "must be menstruating" or that she needed "a good banging"; (4) women were "out to get him" and that women generally conspire with each other against men; (5) Scoggins wished he were a woman so that he could "whore his way through life"; (6) Smith was lucky to have her job, and she would not get any further at First Union because she was not attractive; (7) the "only way for a woman to get ahead at First Union is to spread her legs"; (8) women had no place in management and did not even belong in college; (9) women should be "barefoot and pregnant"; (10) women go through life looking for a man to marry; (11) Barbara Judge, a female supervisor, was "sleeping her way to the top" and therefore she was a "classic example of why women should not be in management"; (12) women's hormones do not allow them to handle work matters in a professional manner.

10

In addition, unlike in Hartsell, Scoggins physically threatened Smith through his harassment. Scoggins often concluded his orders to Smith by saying "or else you'll see what will happen to you." Further, Scoggins made the "slit a woman's throat" remark in the context of physically threatening gestures. See Baskerville v. Culligan Int'l Co., 50 F.3d 428, 431 (7th Cir. 1995) (stating that "remarks accompanied by threatening gestures or contorted facial features, or delivered from so short a distance from the listener's face as to invade the listener's private space" are more harassing than words alone). Scoggins made what a jury could find was a thinly veiled threat to kill Smith because of her gender in a way that made Smith feel that he was serious about harming her, especially in light of Scoggins' boasts about "taking people out" while he was in the military.

Scoggins' threats, his angry late-night phone calls, and his paranoia about women out to "get him" severely frightened Smith. These acts and the constant barrage of discriminatory remarks made by Scoggins unreasonably interfered with Smith's work performance by making her unable to continue working near Scoggins. Smith's therapist and Price, First Union's EAP counselor, confirmed Smith's inability to work in the same area as Scoggins. Therefore, looking at the totality of the circumstances, the factors in Harris strongly weigh toward a finding that Scoggins' harassment, if proven at trial, was sufficiently severe or pervasive so as to create a hostile work environment. The district court incorrectly resolved this question of fact that a jury should decide. See Beardsley v. Webb, 30 F.3d 524, 530 (4th Cir. 1994) (whether harassment was sufficiently severe or pervasive is "quintessentially a question of fact" for the jury).

The last element of a hostile work environment claim is that some basis exists for imputing liability to First Union. The district court held, in its alternative holding, that First Union was not vicariously liable for Scoggins' actions because Smith did not show that First Union "knew or should have known of the illegal conduct and failed to take prompt remedial action." The district court applied the correct test based on controlling Fourth Circuit precedent at the time of its decision. See Andrade v. Mayfair Management, Inc., 88 F.3d 258, 261 (4th Cir. 1996). In July of 1998, however, the Supreme Court decided two cases dealing with vicarious liability in sexual harassment suits.

11

See Faragher v. City of Boca Raton, 118 S. Ct. 2275 (1998); Burlington Indus., Inc. v. Ellereth, 118 S. Ct. 2257 (1998).

In Faragher and Ellereth, the Supreme Court adopted the following test for vicarious liability in sexual harassment cases:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence. The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

Faragher, 118 S. Ct. at 2292-93 (citation omitted); Ellereth, 118 S. Ct. at 2270 (citation omitted). Smith does not allege that she suffered a tangible employment action due to Scoggins' harassment. First Union therefore can raise an affirmative defense to liability for Scoggins' harassment. First Union must prove both elements of the affirmative defense to avoid vicarious liability. [7]

The first element of First Union's affirmative defense is showing that it exercised reasonable care to prevent and correct promptly any sexually harassing behavior. Smith argues that First Union failed to establish the first element of its affirmative defense for two reasons: (1) First Union failed to exercise reasonable care to prevent Scoggins' harassment; and (2) First Union failed to exercise reasonable care to correct promptly Scoggins' harassment. Because First Union cannot

_____

[7] Unlike in Lissau v. Southern Food Serv., Inc., 159 F.3d 177 (4th Cir. 1998), we need not remand this case to the district court to consider the effect of the Faragher-Ellereth test on vicarious liability because the parties have fully briefed the issue and the record is sufficient to make a reasoned determination.

12

establish either of the foregoing propositions as a matter of law, the first element of its affirmative defense, and consequently the defense as a whole, fails.

An employer's adoption of an effective anti-harassment policy is an important factor in determining whether it exercised reasonable care to prevent any sexually harassing behavior. The Supreme Court noted that "[w]hile proof that an employer had promulgated an anti-harassment policy with complaint procedure[s] is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense." Ellereth, 118 S. Ct. at 2270.

The Fourth Circuit interpreted the foregoing Supreme Court decisions in Brown v. Perry, 184 F.3d 388 (4th Cir. 1999). In Brown, this court held that any anti-harassment policy an employer adopts must be "both reasonably designed and reasonably effectual." Id. at 396. The employer prevailed on the first element of its affirmative defense in Brown because the plaintiff did not provide evidence that the employer adopted the policy in bad faith or that the policy was "otherwise defective or dysfunctional."[8] Id.

In the present case, Smith sufficiently alleges that First Union failed to use reasonable efforts to prevent Scoggins' harassment. First Union had an anti-harassment policy that Smith was familiar with. However, unlike in Brown, Smith adequately alleges that the policy was "otherwise defective or dysfunctional." First Union's policy stated the following:

> It is First Union's policy to prohibit sexual harassment of our employees. Sexual harassment includes any unwelcome offensive sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature. This

_____

[8] The employer in Brown also prevailed because the plaintiff "unreasonably failed . . . to avoid harm otherwise" under the second element of the Faragher-Ellereth test. The plaintiff went to her supervisor's apartment at midnight despite her supervisor's past attempt to coerce sexual favors. See id. at 397.

13

policy applies to management employees, nonmanagement employees, outsiders, and customers.

Smith alleges that First Union's policy "makes it sound as though a sexual advance is required in order to be sexually harassed at First Union." Smith therefore did not recognize that Scoggins' harassment, which was gender-based but not sexually provocative, was a violation of the policy. Smith's reading of First Union's policy was entirely reasonable. First Union's policy does not mention discrimination on the basis of gender. It merely prohibits unwanted sexual advances and other sexually provocative misconduct. We therefore cannot hold that, as a matter of law, First Union's policy was a sufficient means of preventing sexual harassment at First Union.

A deficient policy does not necessarily negate an employer's affirmative defense in all cases. Smith also alleges, however, that First Union did not take any steps to prevent sexual harassment other than its policy. In fact, Smith alleges that First Union discouraged complaining about a supervisor's harassing behavior. When Smith started at First Union, Scoggins' boss warned Smith that if she "ever wanted to get anywhere, [I'd] never contradict anyone in an open meeting, and [I'd] never complain to human resources." Employers cannot satisfy the first element of the Faragher-Ellereth affirmative defense if its management-level employees are discouraging the use of the complaint process.

First Union also did not exercise reasonable care to correct promptly Scoggins' harassment. First Union's investigation of Smith's complaints was inadequate. Hutto had never investigated a sexual harassment claim when he investigated Smith's complaints. Hutto's investigation focused on Smith's complaints about Scoggins' management style, and ignored her allegations of sexual harassment. Hutto conceded in his deposition that he was alerted to the sexual content of Scoggins' remarks. Nevertheless, Hutto failed to ask Scoggins whether he made any of the sexually harassing remarks to Smith; in addition, despite Hutto's alleged concern for Smith's safety, he never asked Scoggins about his "slit a woman's throat" remark, nor did he reprimand Scoggins for such an ominous threat. If Hutto had asked Scoggins about Smith's allegations of sexual harassment, he

14

would have discovered that Scoggins admits to making some of the harassing remarks.**9**

George Andrews, Scoggins' boss, worked with Hutto in investigating Smith's complaints. Andrews' report notes a number of the sexually harassing remarks made by Scoggins; it also notes that Barbara Judge told Andrews that another employee had left First Union "due to Ron's (Scoggins') alleged verbal, sexual harassment." Andrews nevertheless failed to characterize Smith's complaints as containing allegations of sexual harassment. Andrews also admits that he should have followed up on the allegation that another employee left the bank because of Scoggins' sexual harassment. However, Andrews failed to follow-up on the allegation, and admits that "I don't know why I didn't follow it up. I don't know."

Andrews also failed to investigate whether Scoggins made the "slit a woman's throat" remark. Andrews testified that Scoggins should have been terminated if he had made that remark. Andrews, however, never asked Scoggins whether he made the remark; he also never asked Hutto if he had concluded whether Scoggins had made the remark.

Perhaps due to First Union's inadequate investigation of Smith's complaints, First Union allowed Scoggins to remain in his position as collection supervisor. First Union never considered transferring Scoggins despite Andrews' admission that Scoggins was qualified to perform a number of other jobs at First Union. Instead, First Union placed Scoggins on probation for ninety days and counseled him to improve his management style and "smile more." First Union's Conference Report, memorializing the reasons for placing Scoggins on probation, does not mention any of the sexually harassing remarks made by Scoggins.

_____

**9** In Scoggins' deposition, he admitted telling Smith that women should not be in management. He also admitted that he told Smith that he wished he was a woman so that he could be a "lady of the evening" all his life, and that women generally conspire with each other against men. Finally, Scoggins admitted that he told Smith, in the context of the O.J. Simpson trial, that he could understand how a "woman would frustrate a man and he would want to choke her." Scoggins denies saying anything about slicing a woman's throat.

15

While Scoggins remained in his former position, First Union insisted on transferring Smith to a position in close proximity to her harasser. First Union was going to transfer Smith to the Val Arthur work-team. The Arthur team, however, was located on the same floor as Scoggins' team; the distance between Scoggins' team and Arthur's team was only 100 feet. The proximity between the teams and the general business practices at First Union made it likely that Smith would have run into Scoggins on a daily basis.

Michael Price, a counselor in First Union's Employee Assistance Program, testified that he told Hutto that Smith should not have been placed in an area where she would have had daily contact with Scoggins. Smith's therapist also concluded that Smith could not work near Scoggins because she feared for her life due to Scoggins' implied threat to "slit a woman's throat." First Union nevertheless told Smith that she had to return to her position in the Consumer Credit Department before she could transfer to a new position. Not until January 26, 1996, almost three months after Smith's complaints, did First Union allow Smith to post for jobs outside her department. Even then, First Union gave Smith only two interviews and no jobs out of the seventy-five positions for which Smith submitted applications.

Given First Union's inadequate investigation, its failure to discuss or even mention the topic of sexual harassment with Scoggins, and its insistence on keeping Smith working in close proximity to Scoggins, a jury could find that First Union did not act with reasonable care to correct promptly Scoggins' harassing behavior. Because a dispute of fact exists as to whether First Union exercised reasonable care to prevent and correct promptly Scoggins' harassment of Smith, First Union cannot rely on an affirmative defense to justify the district court's grant of summary judgment. Accordingly, we decline to decide whether First Union proved the second element of the Faragher-Ellereth test, which is whether Smith unreasonably failed to take advantage of any preventive or corrective opportunities by First Union.

Smith has established a genuine issue of material fact on her sexual harassment claim under Title VII. We therefore reverse the district court's grant of summary judgment in favor of First Union on Smith's sexual harassment claim under Title VII.

16

III.

Smith also alleges a cause of action for sexual harassment under North Carolina's Equal Employment Practices Act (NCEEPA). The NCEEPA provides in pertinent part:

> It is the public policy of this State to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of race, religion, color, national origin, age, sex or handicap by employers which regularly employ 15 or more employees.

N.C. GEN. STAT. § 143-422.2. The issue in the present case is whether Smith can maintain a private cause of action under the NCEEPA.

Neither the North Carolina Supreme Court nor the North Carolina Court of Appeals has recognized a private cause of action under the NCEEPA. Instead, most courts have applied the NCEEPA only to common law wrongful discharge claims or in connection with other specific statutory remedies. See Hughes v. Bedsole, 48 F.3d 1376, 1383-84 & n.6 (4th Cir. 1995) (analyzing the plaintiff's claim under the North Carolina common law of wrongful discharge); Iturbe v. Wandel & Goltermann Techs., 774 F. Supp. 959, 963 (M.D.N.C. 1991); Mayse v. Protective Agency, Inc., 772 F. Supp. 267, 275 (W.D.N.C. 1991); North Carolina Dep't of Correction v. Hodge, 99 N.C. App. 602, 394 S.E.2d 285, 289 (1990) (statutory remedy for state employees).[10]

In Mullis v. Mechanics & Farmers Bank, 994 F. Supp. 680 (M.D.N.C. 1997), the court held that "[a]bsent a clear indication from the courts or the legislature of North Carolina that a private right of action does exist under the NCEEPA, it would be inappropriate for a federal court to create a private right of action under the NCEEPA,

_____

[10] Only one case supports Smith's position that she can maintain a private cause of action under the NCEEPA. In Bass v. City of Wilson, 835 F. Supp. 255 (E.D.N.C. 1993), the magistrate judge denied the defendant's motion to dismiss on the plaintiff's discrimination claim for failure to hire asserted under the NCEEPA.

17

and this court declines to do so." Id. at 687; see also Ridenhour v. Concord Screen Printers, Inc., 40 F. Supp.2d 744, 746 (M.D.N.C. 1999). We agree. We therefore affirm the district court's grant of summary judgment in favor of First Union on Smith's NCEEPA claim.

IV.

Smith next argues that First Union retaliated against her for complaining about Scoggins in violation of Title VII. Title VII makes it an "unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). The district court granted First Union's motion for summary judgment on Smith's retaliation claim because it held that Smith did not exhaust her administrative remedies. Alternatively, the district court held that Smith's retaliation claim failed on the merits.

Before filing suit under Title VII, a plaintiff must exhaust her administrative remedies by bringing a charge with the EEOC. See King v. Seaboard Coast Line R.R. Co., 538 F.2d 581, 583 (4th Cir. 1976). A plaintiff's EEOC charge defines the scope of her subsequent right to institute a civil suit. See Evans v. Technologies Applications and Serv. Co., 80 F.3d 954, 962-63 (4th Cir. 1996). If a plaintiff's claims in her judicial complaint are reasonably related to her EEOC charge and can be expected to follow from a reasonable administrative investigation, the plaintiff may advance such claims in her subsequent civil suit. See Chisholm v. United States Postal Serv., 665 F.2d 482, 491 (4th Cir. 1981).

In the present case, Smith's EEOC charge alleged that First Union retaliated against her by chastising her and threatening to terminate her employment for consulting with counsel. Smith's Complaint alleged that First Union retaliated against her by forcing her to work on Scoggins' floor and by not offering her any other positions at First Union.

The allegations in Smith's Complaint are reasonably related to her EEOC charge and would be expected to follow from an administra-

18

tive investigation. Both Smith's Complaint and her EEOC charge allege retaliatory actions by First Union's management because of her complaints about Scoggins. We therefore can analyze the merits of Smith's retaliation claim.

The McDonnell Douglas burden-shifting scheme applies in analyzing retaliation claims under Title VII. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Ross v. Communications Satellite Corp., 759 F.2d 355, 365 (4th Cir. 1985). First, the plaintiff must establish a prima facie case of retaliation. See Beall v. Abbott Labs., 130 F.3d 614, 619 (4th Cir. 1997). The burden then shifts to the employer to produce a legitimate nondiscriminatory reason for the adverse action. See id. The plaintiff must then demonstrate that the employer's reason was mere pretext for retaliation by showing "both that the reason was false and that discrimination was the real reason for the challenged conduct." Jiminez v. Mary Washington College, 57 F.3d 369, 377-78 (4th Cir. 1995) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993)).

We will assume, arguendo, that Smith has alleged a prima facie case of retaliation.[11] First Union, however, has rebutted Smith's prima

_____

[11] We do so because an element of Smith's prima facie case is that she suffered an "adverse employment action." McNairn v. Sullivan, 929 F.2d 974, 980 (4th Cir. 1991). Smith claims that she suffered an adverse employment action when First Union refused to transfer her to a new position after she complained about Scoggins' harassment. The circuits are split as to whether an act of retaliation must be an "ultimate employment decision" to qualify as an adverse employment action. The Fifth and Eighth Circuits have held that only adverse employment actions that qualify as ultimate employment decisions are actionable under Title VII. See Burger v. Central Apartment Management, Inc., 168 F.3d 875, 878-79 (5th Cir. 1999); Ledergerber v. Stangler, 122 F.3d 1142, 1144 (8th Cir. 1997). Conversely, the First, Ninth, Tenth, and Eleventh Circuits have held that adverse actions that do not qualify as ultimate employment decisions can give rise to liability for retaliation. See Wyatt v. City of Boston, 35 F.3d 13, 15-16 (1st Cir. 1994); Bouman v. Block, 940 F.2d 1211, 1229 (9th Cir. 1991); Berry v. Stevinson Chevrolet, 74 F.3d 980, 985-86 (10th Cir. 1996); Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1456 (11th Cir. 1998); see also Passer v. American Chem. Soc'y, 935 F.2d 322, 331 (D.C. Cir. 1991). The Fourth Circuit has not resolved

19

facie case by alleging a legitimate nondiscriminatory reason for refusing to transfer Smith. First Union alleges that Smith did not receive any of the jobs she applied for because she was not qualified for the positions. First Union points to Smith's admission that most of the jobs that she applied for were at grade 32, which was a grade higher than Smith's grade 30 position as a "team leader." First Union also claims that Smith did not receive a transfer because she was inflexible about interview times or refused to appear for interviews. First Union's legitimate, nondiscriminatory reasons for not transferring Smith force her to come forward with evidence that those reasons were a mere pretext for discrimination.

Smith argues that First Union's nondiscriminatory reasons were pretextual because she was qualified to assume a number of positions for which she did not receive interviews. Smith has listed a number of jobs that she applied for in which she met the minimum qualifications for the positions yet did not receive an interview, including a number of ungraded positions. Smith also alleges that Hutto advised her to apply for jobs for which she did not meet all of the qualifications, as First Union could provide Smith with training. Smith's testimony contradicts Hutto's assertion that Smith should have limited her search to grade 30 positions if she wanted to receive a job. Smith therefore has produced sufficient evidence to create a dispute of fact over whether First Union's legitimate nondiscriminatory reasons were pretextual.

Smith's retaliation claim nevertheless fails as a matter of law because Smith has not produced sufficient evidence that

_____

this issue; however, we noted in a case under 42 U.S.C. § 2000e-16(a), that Title VII "has consistently focused on the question whether there has been discrimination in what could be characterized as ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensating." Page v. Bolger, 645 F.2d 227, 233 (4th Cir. 1981).

In the present case, neither the district court nor the parties addressed the circuit split or our decision in Page. Given our finding that First Union has advanced a legitimate nondiscriminatory alternative for its actions, we await a more appropriate case to decide whether to apply Page in the context of a claim under 42 U.S.C.§ 2000e-3(a).

20

discrimination was the real reason that First Union failed to transfer her to a new position. Smith's evidence that First Union's reasons for transferring her were false is not sufficient to avoid summary judgment on her retaliation claim. The Supreme Court has explained that "a reason cannot be proved to be `a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." St. Mary's, 509 U.S. at 515 (quoting Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981)). In applying St. Mary's, we have held "that to survive a motion for summary judgment under the McDonnell Douglas paradigm the plaintiff must do more than merely raise a jury question about the veracity of the employer's proffered justification. The plaintiff must have developed some evidence on which a juror could reasonably base a finding that discrimination motivated the challenged employment action." Vaughan v. The Metrahealth Cos., 145 F.3d 197, 202 (4th Cir. 1998).

Smith has failed to produce sufficient evidence that discrimination motivated First Union's failure to transfer her to a new position. Smith's only evidence of retaliatory motive relates to Hutto's conduct regarding Smith's decision to stay home from work. When Smith told Hutto that her therapist was keeping her out of work and she was going to file a claim for disability benefits, Hutto became annoyed; he warned Smith that she would be subject to termination if she did not submit her disability forms within fifteen days.

Smith's proffered evidence suggests that Hutto may have harbored animus against Smith for filing her disability claim. Smith advances no evidence, however, that Hutto or anyone else at First Union harbored animus against her for complaining about Scoggins or for filing a Complaint with the EEOC. Instead, the evidence suggests that First Union did not take Smith's allegations seriously, and would have preferred that Smith work for the Arthur team, in close proximity to Scoggins. Consequently, First Union was simply indifferent to Smith's request for a transfer. While First Union's indifference to Smith's complaints is fatal to First Union's chances of avoiding vicarious liability under Smith's hostile work environment claim, discussed above, First Union's indifference is insufficient to support an inference that First Union acted with retaliatory intent. We therefore affirm the district court's grant of summary judgment in favor of First Union on Smith's retaliation claim.

21

V.

Smith next argues that the district court erred in granting summary judgment in favor of First Union on Smith's claim for negligent supervision or retention. In North Carolina, a plaintiff must prove two elements to hold an employer liable for negligent supervision or retention: (1) that an incompetent employee committed a tortious act resulting in injury to the plaintiff; and (2) that prior to the act, the employer knew or had reason to know of the employee's incompetency. See Hogan v. Forsyth Country Club Co., 79 N.C. App. 483, 340 S.E.2d 116, 124 (1986).

Smith's negligent supervision or retention claim fails because First Union did not know or have reason to know of Scoggins' harassment before she complained to Hutto on November 3, 1995. Smith argues that First Union had reason to know of Scoggins' harassment because he made many of his derogatory remarks in open team meetings. Smith does not allege, however, that any of Scoggins' supervisors were present at these meetings, nor does she allege that they became aware of Scoggins' harassing remarks prior to November 3, 1995.

Smith also argues that First Union had reason to know of Scoggins' harassment because a previous female employee had complained about Scoggins addressing her as "honey" or"sweetheart." However, Scoggins' supervisor counseled Scoggins to stop using these demeaning titles and he complied. First Union did not become aware of any other allegations concerning Scoggins until November 3, 1995. First Union therefore had no reason to believe that Scoggins had a propensity for engaging in sexually harassing behavior.

Smith fails to create a genuine dispute of material fact as to whether First Union knew or had reason to know of Scoggins' harassment before November 3, 1995. The district court properly granted summary judgment to First Union on Smith's negligent supervision or retention claim.[12]

_____

[12] Because Smith has failed to sufficiently allege the constructive notice element of her negligent supervision or retention claim, we decline to decide whether a Title VII violation can be the underlying tort for a negligent supervision or retention claim under North Carolina law. See Hartsell, 123 F.3d at 774.

22

VI.

Finally, Smith alleges a cause of action for overtime pay based on the provisions of the FLSA. The district court granted First Union's motion for summary judgment on Smith's claim for overtime pay because she was an exempt executive employee under the FLSA.

Smith began her career at First Union as an adjustor, which was a nonexempt position subject to the FLSA. In January of 1993, First Union promoted Smith to the position of team leader. The team leader position was a salaried position that involved working up to sixty hours a week.

Section (7)(a)(1) of the FLSA requires that employers pay their employees time and a half for work over forty hours a week. See 29 U.S.C. § 207(a)(1). The FLSA, however, provides an exemption from the overtime requirement for persons "employed in a bona fide executive, administrative, or professional capacity." Id. § 213(a)(1).

Because Smith earned more than $250.00 a week at First Union, the Department of Labor's "short test" applies in determining whether she is exempt under the FLSA. See 29 C.F.R.§ 541.119(a) (1998). An employee will be exempt under the executive exemption's short test if: (1) the employee's primary duty consists of the management of the enterprise or of a customarily recognized department or subdivision thereof; and (2) includes the customary and regular direction of the work of two or more other employees therein. See id.; West v. Anne Arundel County, 137 F.3d 752, 763 (4th Cir. 1998).

The first element of the short test is whether Smith's primary duty as a team leader consisted of managing the adjustors. An employee's primary duty is normally one that comprises more than 50% of the employee's time. See 29 C.F.R. § 541.103; Clark v. J.M. Benson Co., 789 F.2d 282, 286 (4th Cir. 1986). "Time alone, however, is not the sole test, and in situations where the employee does not spend over 50 percent of his time in managerial duties, he might nevertheless have management as his primary duty if the other pertinent factors support such a conclusion." 29 C.F.R. § 541.103.

23

Smith claims that she spent between 80 and 90% of her time doing the work of an adjustor, a position that did not include management responsibility.**13** Smith argues that her assessment of the time she spent in management is sufficient to create a dispute of fact about her status as exempt under the FLSA. See Clark, 789 F.2d at 286 n.2 (deviating from the 50% "rule of thumb" requires consideration of the factual circumstances for which a jury is more appropriate).

Smith's work as an adjustor, however, was with accounts that were delinquent or within "problem areas." Scoggins assigned Smith to areas that had unusually high delinquencies so Smith could get the area "under control." Further, Smith would handle accounts when an adjustor could not solve the customer's problems. Smith also would assist individual adjustors when improving the collection percentages of that area was necessary.

The Regulations expressly recognize that employees who are responsible for the more difficult and complex tasks in a department will have management as their primary duty. See 29 C.F.R. § 541.103 ("In the data processing field an employee who directs the day-to-day activities of a single group of programmers and who performs the more complex or responsible jobs in programming will be considered to have management as his primary duty."). Smith's work as an adjustor therefore was in a managerial capacity.

Smith also testified that she had greater responsibility than other team members, including her duty to review the work of the adjustors before she gave their files to Scoggins. Smith's affidavit included a job description for the collection team leader position which she claimed was "for essentially the job [she] was doing." The job description lists the following duties:

> Ensure collection practices and procedures are established and adhered to so that risks are minimized. Maintain quality control checks to ensure corporate and regulatory compliance. Ensure Fuheb's delinquency ration goals are consistently met. Review problem assets accounts to identify and

_____

**13** Smith equates her position to that of a "working foreman." See 29 C.F.R. § 541.115.

24

minimize potential loss. Establish productivity and quality goals with team and management. Encourage individual achievement and provide ongoing feedback, and implement plans to improve employee satisfaction.

These tasks are clearly managerial.

The second element of the executive exemption's short test is whether Smith's primary duty included the customary and regular direction of the work of two or more employees. Smith attempts to create a dispute of fact about her supervisory status by arguing that Scoggins closely monitored her actions. Scoggins controlled the scheduling and the work assignments of all the employees under Smith's supervision. Smith therefore argues that she did not "supervise" any employees within the meaning of the Regulations.

Smith admitted in her deposition that she supervised the sixteen adjustors on her team; she participated in interviewing new adjustors and trained new personnel on policies, procedures, and collection techniques. Smith's resume also shows that she supervised two or more employees. Smith's resume listed many supervisory duties, including managing the adjustors, monitoring and reviewing team performance, directing work flow, training adjustors, and counseling adjustors on problem accounts. First Union therefore has established the second element of the executive exemption's"short test."

First Union has established that Smith met both elements of the executive exemption under the FLSA. We therefore affirm the district court's grant of summary judgment in favor of First Union on Smith's claim for overtime pay under the FLSA.

VII.

For the foregoing reasons, we reverse and remand the judgment of the district court as to Smith's sexual harassment claim under Title VII. As to Smith's remaining claims, we affirm the judgment of the district court.

AFFIRMED IN PART, REVERSED IN PART,
AND REMANDED

25