Christopher D. **WAGSTAFF**, Plaintiff,

v.

**CITY OF DURHAM**, Defendant.

No. 1:01–CV–00615.

United States District Court, M.D. North Carolina.

Nov. 25, 2002.

Joy Rhyne Webb, Browne, Flebotte, Wilson & Horn, P.L.L.C., Durham, NC, for plaintiff.

Thomas H. Lee, Jr., Joel Miller Craig, Newsom, Graham, Hedrick & Kennon, P.A., Patrick W. Baker, Office of City Attorney, Durham, NC, for defendant.

## MEMORANDUM OPINION

OSTEEN, District Judge.

Plaintiff Christopher Douglas Wagstaff ("Wagstaff") brought this action against his employer, the City of Durham ("the City"), in Durham County Superior Court, on May 23, 2001. Plaintiff alleges that by selecting someone else for a position in the Durham Police Department, the City engaged in racial discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* Plaintiff further claims, also under Title VII, that the City retaliated against him for bringing discrimination charges associated with that particular hiring. Defendant removed the case to this court on June 21, 2001.

The matter is before the court on Defendant City of Durham's Motion for Summary Judgment. For the reasons set forth below, the motion will be granted.

## I. FACTUAL BACKGROUND

Plaintiff Wagstaff, who is black, started working for the City of Durham's police department in May 1993. (Wagstaff Dep. at 13–14.) After initial training, he served as a patrol officer in the department's District 3, then transferred to District 1 in 1994. (*Id.* at 25.) In October 1995, Wagstaff applied for and received a transfer to the Crime Area Target Team ("CATT"), the City's community policing unit.[1] (*Id.* at 26.) As a CATT member, Wagstaff became involved in the local community by identifying illegal activity, attending group meetings, following up on neighborhood complaints, and interacting with residents. (*Id.* at 27–31.) Like other CATT officers, he also participated in undercover operations to root out drug dealing and prostitution.

In July 1999, Plaintiff was promoted to corporal, which required him to return to uniformed patrol duty outside the CATT unit but still in District 1.[2] (*Id.* at 41–42, 50.) To win this promotion, Plaintiff submitted a résumé and a letter of interest, took a written test, and passed an oral evaluation. (*Id.* at 39.)

In February 2000, Wagstaff submitted a letter of interest in a corporal position on the District 1 CATT team, a position he knew would be vacant after Corporal Jerry Johnson's retirement on March 1. (*Id.* at 55–56; *Id.* Ex. 1.) Plaintiff next heard about the position from Sergeant Maurice Hayes, who called him on the morning of February 21, 2000, and told him, "Wag, you got the job."[3] (*Id.* at 57.) Wagstaff immediately called his wife and told several other people about the change. (*Id.* at 59, 63–65.) Hayes also told members of the CATT team that Corporal Wagstaff would replace Corporal Johnson. (Minor Dep. at 18.) Several days later, Sergeant Hayes told Plaintiff that an interview would be necessary. (Wagstaff Dep. at

---

1. At the time, the CATT unit operated in all parts of Durham. In 1997, the police department created CATT units in each of the city's districts. (Wagstaff Dep. at 30–31.) Plaintiff Wagstaff was assigned to the CATT team in District 1.

2. Plaintiff believes that his previous application for a promotion, in 1996 or 1997, was frustrated due to racial discrimination. (Wagstaff Dep. at 42–50.)

3. This message resulted from an informal vote that Sergeant Hayes had conducted during a meeting of the District 1 CATT unit. He informed the team that three people had applied to replace Corporal Johnson, then "he asked each one of us, the entire team, who did we want to be our corporal? And everybody was present, and he pointed at each one of us. And each one of us said [']Wagstaff.[']" (Jack Cates Dep. at 9–10.) When the voting ended, Sergeant Hayes said, "Wag it is. You've got it." (*Id.* at 10.) Significantly, however, Plaintiff presents no evidence that Sergeant Hayes had authority to award him the corporal position on the District 1 CATT team.

66.) According to Plaintiff, Hayes said, "They just need to interview you. It's just a formality. You got the job." (*Id.* at 66.) Lieutenant C.M. Bullock, who is black, told Plaintiff on Friday that his interview would take place the following Monday. (*Id.* at 67.) Wagstaff thought the interview unnecessary because he had been told that he had the job. (*Id.* at 71.)

Selection of the next District 1 CATT corporal fell within the discretion of Captain Robin James. (James Aff. ¶ 6; Chalmers Aff. ¶¶ 3, 5.) James, who is white, "initially intended to select Cpl. Wagstaff" for the position, but first he consulted with his superior officer, Major Steven W. Chalmers. (James Aff. ¶ 9; Chalmers Aff. ¶ 6.) Chalmers, who is black, told James that "although no evaluation process was required, such a process would allow for fair consideration" of the three candidates who had applied for the job. (Chalmers Aff. ¶ 9.) James heeded this advice. (James Aff. ¶ 10; Chalmers Aff. ¶ 10.) He created interview questions and a written exercise designed to evaluate the applicants by testing their communication skills and "relevant areas of knowledge." (James Aff. ¶ 12.)

Wagstaff's interview took place at the District 1 police station. (Wagstaff Dep. at 69.) Captain James and Lieutenant Bullock conducted the interview. (Wagstaff Dep. at 69; Bullock Aff. ¶ 9; James Aff. ¶ 11.) For 45 minutes, they asked Wagstaff several questions about community policing, then gave him an hour to draft an operations plan to address hypothetical complaints about drug sales at a particular location. (Wagstaff Dep. at 75; Bullock Aff. ¶ 9; James Aff. ¶ 11.) All of the candidates for the job completed the same process (James Aff. ¶ 11; Bullock Aff. ¶ 9), but Wagstaff had "never been trained" to write an operations plan, and he "didn't know how to write it." (Wagstaff Dep. at 75.) When Wagstaff completed the operations plan, he turned it in to Captain James. Plaintiff asserts that James "took it and threw it on the table just like it was a piece of trash." (*Id.* at 80.)

After interviewing the candidates and administering the written exercise, Captain James and Lieutenant Bullock conferred. (James Aff. ¶ 13; Bullock Aff. ¶ 11.) Based on their evaluation of the candidates' interviews and written exercises, they agreed that Corporal Kevin Cates, who is white, would receive the corporal position on the District 1 CATT team. (James Aff. ¶ 14; Bullock Aff. ¶ 14.) Cates had "excelled in the interview and written exercise" and performed better than Wagstaff in those areas. (James Aff. ¶¶ 14, 15; Bullock Aff. ¶¶ 14, 15.) Three days after Plaintiff's interview, James called Wagstaff to his office and told him that the job had been awarded to Corporal Cates. (Wagstaff Dep. at 82.)

Wagstaff was "disappointed" with this decision. (*Id.* at 83.) He believed that he had been discriminated against based on his race, and he sought a transfer out of District 1. (*Id.* at 84.) He lodged a complaint with his superior officer, Lieutenant Bullock, arguing that "[t]here was no need to start a [hiring] process after someone was told they had the job." (*Id.* at 83.) Wagstaff also met twice with Major Chalmers, reiterating his charge of racism and his desire for a transfer. (*Id.* at 85, 88–89.) He lost enthusiasm for his work and perceived that he was "treated differently" by the command staff after the episode. (*Id.* at 133; Bullock Aff. ¶ 17.)

On March 27, 2000, Wagstaff missed a mandatory supervisors' meeting. Lieutenant Bullock called Wagstaff into his office on March 30, 2000, and handed him a "Notice of Disciplinary Action" for missing the meeting. (Wagstaff Dep. at 98; *Id.* Ex. 6.) Three hours after receiving this

written reprimand, Wagstaff's request for a transfer out of District 1 was granted.[4]

Wagstaff challenged the decision to award the District 1 CATT corporal position to Cates. In addition to Wagstaff's protest to Lieutenant Bullock and his verbal complaints to Major Chalmers, he filed a written grievance requesting a departmental level hearing. That hearing produced a finding that no evidence supported his claims of racial discrimination or retaliation. (Compl.¶ 25.) On August 9, 2000, Plaintiff filed a claim with the Durham Human Relations Commission alleging racial discrimination and retaliation. This claim subsequently was filed with the Equal Employment Opportunity Commission, which issued a right-to-sue letter on February 23, 2001. Wagstaff filed this action one month later.

## II. DISCUSSION

### A. Standard of Review

Summary judgment is appropriate when the pleadings and other submissions, viewed in the light most favorable to the plaintiff, show that no genuine issue of material fact exists, and that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). A mere scintilla of evidence supporting plaintiff's claims is insufficient to overcome a motion for summary judgment;

there must be enough evidence for a reasonable jury to find for the plaintiff. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

Under the scheme established by *McDonnell Douglas Corp. v. Green,*[5] a Title VII plaintiff must establish a prima facie case of discrimination. *Id.,* 411 U.S. at 802, 93 S.Ct. at 1824. If the plaintiff succeeds in establishing a prima facie case, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its action. *Id.* If this showing is made, the "presumption of discrimination drops out of the picture," and the plaintiff must prove that the legitimate, nondiscriminatory reasons offered by the employer were merely a pretext for discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000); *see also St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 519, 113 S.Ct. 2742, 2754, 125 L.Ed.2d 407 (1993) ("It is not enough ... to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination."). Although the *McDonnell Douglas* regime involves alternating burdens on the parties, the " 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.' " *Reeves,* 530 U.S. at 143, 120 S.Ct. at 2106 (quoting *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981)). This basic framework applies to both of Plaintiff's Title VII claims.

4. Plaintiff contends that the three-week delay between his request for a transfer out of District 1 and his actual departure from District 1 was inappropriate, because he knew of other transfer requests that had been granted in less time. (Wagstaff Dep. at 99.) Other than

this observation, he attaches no significance to the timing of the transfer. (*Id.*)

5. 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

## B. Racial Discrimination

Wagstaff argues that the City discriminated against him on the basis of race by awarding the District 1 CATT corporal position to a white man after Plaintiff was led to believe he had been awarded the job. In support of its motion for summary judgment, the City responds that its rejection of Plaintiff's application was not an adverse employment action covered by Title VII. The City also contends that its decision to award the position to Corporal Cates instead of Corporal Wagstaff was based on their performance on the oral interviews and written exercises, not on race.

 To establish a prima facie case of racial discrimination under *McDonnell Douglas,* a plaintiff must show that: (1) he is a member of a protected class; (2) he suffered some adverse employment action; (3) his job performance met the employer's legitimate expectations; and (4) the adverse employment action occurred under circumstances that support an inference of unlawful discrimination. *McKiver v. General Electric Co.,* 11 F.Supp.2d 755, 758 (M.D.N.C.1997) (citing *St. Mary's Honor Ctr.,* 509 U.S. at 506, 113 S.Ct. at 2742); *see also McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824 (acknowledging that the components of the test will vary with different applications of Title VII). Title VII "affords no protection from discrimination unless there has been some adverse employment action by the employer." *Bristow v. Daily Press, Inc.,* 770 F.2d 1251, 1255 (4th Cir.1985). The Supreme Court defines "adverse employment action" as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus. v. Ellerth,* 524 U.S. 742, 761, 118 S.Ct. 2257, 2269, 141 L.Ed.2d 633 (1998). In determining what constitutes an adverse employment action for Title VII purposes, the Fourth Circuit consistently has focused on "whether there has been discrimination in what could be characterized as ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensating." *Page v. Bolger,* 645 F.2d 227, 233 (4th Cir.1981). An employment decision may be "adverse," however, without being "ultimate." *See Von Gunten v. Maryland,* 243 F.3d 858, 865 (4th Cir.2001) (observing that "conduct short of 'ultimate employment decisions' can constitute adverse employment action for purposes of § 2000e–3," and that "conformity between the provisions of Title VII is to be preferred") (quoting *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 366 (4th Cir.1985)).

 An employer's failure to promote an employee constitutes an adverse employment action, *see Burlington Indus.,* 524 U.S. at 761, 118 S.Ct. at 2269, but a mere refusal to grant a transfer that an employee desires does not qualify as an adverse employment action unless the decision "had some significant detrimental effect" on the employee. *Boone v. Goldin,* 178 F.3d 253, 256 (4th Cir.1999); *see also Brown v. Brody,* 199 F.3d 446, 456–57 (D.C.Cir.1999). Significant detrimental effects on an employee include reduced pay, a diminished opportunity for promotion, less responsibility, or a lower rank. *See Boone,* 178 F.3d at 257. A "clear trend of authority" holds that a "'transfer that does not involve a demotion in form or substance[ ] cannot rise to the level of a materially adverse employment action.'" *Brown,* 199 F.3d at 456–57 (quoting *Ledergerber v. Stangler,* 122 F.3d 1142, 1144 (8th Cir.1997), *Williams v. Bristol–Myers Squibb Co.,* 85 F.3d 270, 274 (7th Cir. 1996)). "[A]bsent any decrease in compensation, job title, level of responsibility, or opportunity for promotion, reassignment

to a new position commensurate with one's salary level does not constitute an adverse employment action." *Boone*, 178 F.3d at 256–57; *accord Watts v. Kroger Co.*, 170 F.3d 505, 512 (5th Cir.1999). This rule regarding transfers applies with equal force to the denial of transfer requests. *See LePique v. Hove*, 217 F.3d 1012, 1014 (8th Cir.2000) (finding "no reason to suppose" that a failure to transfer should be "treated any differently" than an actual transfer).

■ As this authority indicates, to find for Plaintiff Wagstaff the court must determine that the City's decision not to award him the District 1 CATT team corporal position constituted an adverse employment action.[6] To avoid summary judgment, Wagstaff must point to a genuine issue of material fact either that his desired move to the CATT team was a promotion, *see Burlington Indus.*, 524 U.S. at 761, 118 S.Ct. at 2269, or that the City's refusal of his requested transfer resulted in a "significant detrimental effect" in his employment status. *Boone*, 178 F.3d at 256 (quoting *Burlington Indus.*, 524 U.S. at 761, 118 S.Ct. at 2268).

The City asserts that Plaintiff Wagstaff's desire to move from his corporal position as a uniformed patrol officer to replace the retiring corporal of the CATT team was a transfer. (Def.'s Br. Support Mot. Summ. J. at 15.) Wagstaff does not refute this argument; although he attempts to distinguish the cases on which the City relies, he does not contend that the CATT position represented a promotion. Instead, Wagstaff contends that the City's rejection of his application for the position was "an ultimate employment decision" that entailed "significant differ-

ences" between the job he had and the job he sought. (Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J. at 15.)

By moving to the CATT team, Wagstaff would have experienced the following changes in benefits: the use of a pager; access to a vehicle to drive between his home, work, and off-duty assignments; and a different schedule. (*Id.*; Wagstaff Dep. at 117–18; Wagstaff Aff. ¶¶ 4, 5.) Plaintiff places particular emphasis on the scheduling differences between uniformed patrol officers and CATT members. CATT members work 10–hour shifts, alternating day and night shifts. Under this arrangement, Plaintiff expected to have every Sunday and Monday off. Uniformed patrol officers, by contrast, work 12–hour shifts for three consecutive days, then have a day off. (Green Dep. at 14–15.) As a result, CATT officers work 16 shifts per month and uniformed patrolmen work 14 shifts per month. (*Id.*) Both sets of officers, however, work the same number of hours per month. (*Id.*) The CATT schedule would have enabled Wagstaff to attend college and spend time with his family in more regular intervals. (Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J. at 16.) These benefits, Wagstaff argues, were significant enough to raise a genuine issue of material fact as to whether the City's decision constituted an adverse employment action, even though Plaintiff had not been denied a promotion. (*Id.*)

The court disagrees. Although a move from uniformed patrol to CATT promised some changes for Wagstaff, those differences were not sufficiently significant to support a finding that an adverse employment action occurred. The schedules of

---

**6.** This determination is an objective one. *See Stout v. Kimberly Clark Corp.*, 201 F.Supp.2d 593, 602 (M.D.N.C.2002) ("Determining whether a current employee's request for another position ... should be classified as a

request for a lateral transfer or a promotion is an objective determination.") (citing *Doe v. Dekalb County Sch. Dist.*, 145 F.3d 1441, 1448–50 (11th Cir.1998)).

patrol officers and CATT team members are structured differently, but officers of both units must work the same number of hours. (*Id.* at 14–15.) "[M]erely changing [a plaintiff's] hours does not constitute an adverse employment action." *Stout v. Kimberly Clark Corp.*, 201 F.Supp.2d 593, 603 (M.D.N.C.2002) (quoting *Benningfield v. City of Houston*, 157 F.3d 369, 377 (5th Cir.1998)). Had Wagstaff become a CATT corporal, he would have maintained the same rank, worked the same number of hours per month, and earned the same salary he enjoyed in his job as a uniformed patrol corporal. CATT officers are not entitled to work any particular shift, and their schedules may be changed whenever the need arises. (Bullock Aff. ¶ 6.) Wagstaff does not contend that his job responsibilities, prestige, or opportunity for promotion have been harmed by the City's decision. CATT members frequently receive a pager and departmental vehicle, (Wagstaff Dep. at 118, 121–22), but the Fourth Circuit has expressed its "certainty that Congress did not intend Title VII to provide redress for trivial discomforts endemic to employment." *Boone*, 178 F.3d at 256 (affirming summary judgment for employer where the plaintiff engineer had been transferred from an acoustics laboratory to a wind tunnel, because the change did not constitute an adverse employment action). In short, the benefits that accompanied the CATT position simply do not qualify as "significant" in light of the fact that the primary components of Plaintiff's job—rank, wages, number of hours—remained the same. *See id.* at 256–57 (finding that absent changes in "compensation, job title, level of responsibility, or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an adverse employment action"); *Brown*, 199 F.3d at 457 (observing that "[m]ere idiosyncracies of personal preference are not sufficient to state an injury"); *Stewart v. Ashcroft*, 211 F.Supp.2d 166, 174–75 (D.D.C.2002) (holding that a refusal to transfer is not an adverse employment action when wages, promotional opportunity, and job responsibilities remain unaffected). Accordingly, Plaintiff has not shown that the denial of his application to transfer to the CATT team constituted an adverse employment action.

Plaintiff cannot demonstrate that his racial discrimination claim arises from an adverse employment action, and Title VII does not provide a remedy for alleged discrimination absent such a showing. *Boone*, 178 F.3d at 256 (invoking "clear precedent indicating that Title VII awards damages 'only against employers who are proven to have taken adverse employment action' for a discriminatory reason") (citing *St. Mary's Honor Ctr.*, 509 U.S. at 523–24, 113 S.Ct. at 2756). Therefore, the City's motion for summary judgment on Plaintiff's racial discrimination claim will be granted.

## C. Retaliation

Wagstaff also alleges that by giving him a written warning for missing a supervisors' meeting, the City retaliated against him for claiming that he was denied the CATT corporal position due to racial discrimination. (Compl.¶ 34.) The City responds that any action taken regarding Wagstaff does not constitute an adverse employment action sufficient to support a claim of retaliation. In addition, the City argues that even if an adverse action occurred, Plaintiff has failed to demonstrate a causal connection between his discrimination charges and the written warning. Finally, the City offers a legitimate purpose for its conduct toward Plaintiff Wagstaff and contends that Plaintiff fails to establish that this explanation acts merely as a pretext for retaliatory conduct.

To prevail on a Title VII retaliation claim, a plaintiff must satisfy the burden of proof framework established in *McDonnell Douglas.* To establish a prima facie case of retaliation under Title VII, a plaintiff must show that: (1) he engaged in a protected activity; (2) he suffered an adverse employment action by his employer; and (3) a causal connection existed between the protected activity and the adverse action. *Von Gunten v. Maryland,* 243 F.3d 858, 863 (4th Cir.2001). After the plaintiff sets forth a prima facie case, the employer bears the burden of producing a legitimate, non-discriminatory reason for its action; once this showing is made, the plaintiff must prove that the proffered reason is merely a pretext for retaliation. *Smith v. First Union Nat'l Bank,* 202 F.3d 234, 248 (4th Cir.2000); *Beall v. Abbott Labs.,* 130 F.3d 614, 619 (4th Cir.1997). Despite the shifting burdens of the *McDonnell Douglas* scheme, the plaintiff bears the ultimate burden of proving discrimination. *Reeves,* 530 U.S. at 143, 120 S.Ct. at 2106.

Here, Plaintiff Wagstaff plainly has established two of the three elements of his prima facie case. By complaining about racial discrimination in the hiring process, Wagstaff engaged in an activity protected by Title VII. *See* 42 U.S.C. § 2000e–3(a) (forbidding employers from retaliating against an employee who charges discrimination). In addition, the temporal proximity of Wagstaff's discrimination allegations and his written warning for missing a mandatory supervisors' meeting raises an in-ference of causality. *See Matvia v. Bald Head Island Mgmt., Inc.,* 259 F.3d 261, 271 (4th Cir.2001); *Tinsley v. First Union Nat'l Bank,* 155 F.3d 435, 443 (4th Cir. 1998) (citing *Williams v. Cerberonics, Inc.,* 871 F.2d 452, 457 (4th Cir.1989)).

Plaintiff fails, however, to demonstrate that the City took an adverse disciplinary action against him. To qualify as an adverse employment action, the employer's conduct toward the plaintiff must adversely affect "the terms, conditions, or benefits" of her employment. *Von Gunten,* 243 F.3d at 865 (quoting *Munday v. Waste Mgmt. of North America, Inc.,* 126 F.3d 239, 243 (4th Cir.1997)). After Plaintiff missed a mandatory supervisors' meeting on March 27, 2000, Lieutenant Bullock drafted a memorandum concerning the incident and conducted a "coaching and counseling session" with Wagstaff.[7] Although the memorandum alerting Plaintiff to the City's displeasure with his absence at the mandatory meeting was labeled "Notice of Disciplinary Action," this title alone is not dispositive. Indeed, after a departmental hearing on the matter, it was determined that "the written coaching and counseling did not constitute discipline in the negative sense and that the document itself therefore incorrectly referenced disciplinary action." (Chalmers Aff. ¶ 20.) Major Chalmers stated that "the coaching and counseling is not considered to constitute adverse disciplinary action." (*Id.* ¶ 22.) Because of this fact, the depart-

---

7. In its entirety, the text of the short memorandum reads:

On Tuesday, March 27, 2000, you were absent from the mandatory district supervisors' meeting. Your absence is unexcused in that you did not give notice to Captain James, District Commander[,] or me that your [*sic*] would not be in attendance at the supervisors' meeting. You are receiving a coaching and counseling session in reference to your unexcused absence. You are required to sign and date this memoran-dum. Please be reminded that the City has an Employee Assistance Program. If you are having a personal/medical problem which you feel is affecting your job performance, you may want to contact the Employee Relations Coordinator who will arrange an appointment with you. You are required to sign and date this memorandum. Your signature does not infer approval or disapproval.

(Wagstaff Dep. Ex. 6.)

ment removed the memorandum entitled "Notice of Disciplinary Action" from Wagstaff's file because it "incorrectly referenced disciplinary action." (*Id.* ¶ 20.) In its place, the City inserted a notation that a coaching and counseling session occurred. (*Id.* ¶ 20.)[8] In short, the City's evidence indicates that such coaching and counseling is not a disciplinary action, and Plaintiff presents no evidence beyond the title of the initial memorandum to contradict this assertion.

Plaintiff argues that the City's action "*could* clearly have an adverse effect on the terms of Plaintiff's employment." (Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J. at 17) (emphasis added). Plaintiff's burden, however, is to show that the warning *did* have such an effect. *See Von Gunten*, 243 F.3d at 866 ("Adverse employment action includes any retaliatory act or harassment if, but only if, that act or harassment results in an adverse effect on the 'terms, conditions, or benefits' of employment.") (quoting *Munday*, 126 F.3d at 243). Because Plaintiff fails to establish the third and final element of his prima facie case of retaliation, the City's motion for summary judgment on that claim will be granted.

■ In addition, the court notes that even if the coaching and counseling administered to Plaintiff constituted an adverse employment action, the City has produced a legitimate, nondiscriminatory reason for its treatment of Wagstaff: to convey to him the importance of attending mandatory meetings. (Bullock Aff. ¶ 21.) To prove discrimination under the *McDonnell Douglas* framework, Plaintiff must demonstrate that this explanation is a pretext for retaliation. *Smith,* 202 F.3d at 248. Plaintiff attempts to carry this burden by arguing that the City's "proffered reason

... had never been important until Plaintiff missed a supervisory meeting[,] which gave Defendant the opportunity to give him a written warning." (Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J. at 18.)

To support this argument, Plaintiff asserts that other employees had missed mandatory meetings without receiving a coaching session. (*Id.*) The employees specifically cited for this proposition are Kevin Cates, who was awarded the CATT corporal position over Wagstaff; Willie Long, who missed the same meeting as Wagstaff; Corporal Grugan; and Jerry Johnson. No evidence indicates, however, that the absences of Cates or Grugan were unexcused, or that Grugan avoided discipline for his absence. *See* Wagstaff Dep. at 136–38. Long missed the same meeting as Wagstaff and received the same coaching as Wagstaff, despite the fact that he had raised no previous charges of discrimination. Only Johnson missed a meeting without excuse and without receiving a counseling session, (Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J. Ex. 9), but his imminent retirement distinguishes his situation from Plaintiff's; the City's purpose—to convey the importance of attending meetings by enforcing mandatory attendance—applies differently to the soon-to-be-departed Johnson. Finally, the mandatory supervisors' meetings had started scant months before Plaintiff received counseling for missing one. (*Id.* at 48.) This fact helps explain why mandatory attendance at the meetings previously had not been important. Taken together, the evidence that similarly situated employees missed supervisors' meetings without consequences is insubstantial.

A mere scintilla of evidence supporting Wagstaff's claims is insufficient to over-

---

**8.** The Fourth Circuit has upheld summary judgment based on the absence of an adverse employment action where a formal disciplinary warning was removed from a plaintiff's file. *See Hopkins v. Baltimore Gas and Elec. Co.,* 77 F.3d 745, 755 (4th Cir.1996).

come a motion for summary judgment; there must be enough evidence for a reasonable jury to find for plaintiff. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). The essential question is whether the evidence is "so one-sided that one party must prevail as a matter of law." *Id.* Here, Plaintiff has failed to present a genuine issue of material fact as to whether the City took an adverse employment action against him in retaliation for his protected conduct. Even if such an issue existed, moreover, Plaintiff has failed to show that the City's proffered reason was pretextual. Therefore, the City's motion for summary judgment on Plaintiff's retaliation claim will be granted.

A judgment in accordance with this memorandum opinion shall be filed contemporaneously herewith.